O

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH A. AUFMAN and | § | |
| JUDITH A. AUFMAN, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. H-04-3449 |
| v. | § | |
| | § | |
| THE GOVERNMENT OF JAPAN, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM AND ORDER

Pending are Plaintiffs Joseph A. Aufman's and Judith A. Aufman's Motion for Summary Judgment (Document No. 13) and Defendant The Government of Japan's Cross-Motion for Summary Judgment (Document No. 18). After carefully considering the motions, responses, replies, surreply, supplemental filings, and the applicable law, the Court concludes that Defendant's motion should be granted.

I.  Background

Plaintiffs Joseph A. Aufman and Judith A. Aufman own Lot 16 in the Farnham Park subdivision of the City of Piney Point Village in Harris County, Texas.  Defendant The Government of Japan owns adjoining Lot 17, which is where Defendant's Consul-General resides.  At issue is whether Defendant can invoke a restriction

contained in a deed in Plaintiffs' chain of title to preclude Plaintiffs from building a residence on Lot 16.

In 1968 Farnham Corp. subdivided a 35-acre tract of land into Farnham Park Subdivision, and filed in the County's Real Property Records general restrictions ("FP Restrictions") applicable to all lots and building sites in the subdivision. Document No. 18 ex. B., at 1. Lots 15, 16, and 17 in the subdivision are situated on the same side of the street, one next to the other in that numerical order.

In 1972 Farnham Corp. conveyed adjacent Lots 16 and 17 to James L. Goette Building Company ("Goette Co.") by general warranty deed, subject to the FP Restrictions, which company in turn conveyed those two lots to James L. Goette ("Goette"). *See* id. exs. D, M. Later that year Goette sold Lot 16 (the "key" lot between Lots 15 and 17) to William K. Bondesen and Norma R. Bondesen (the "Bondesens"). On the same day that they purchased Lot 16 from Goette, the Bondesens also bought Lot 15 from one Aubrey Farb.[1] *See* id. exs. E-F. The deeds conveying these two Lots to the Bondesens were both expressly subject to the FP Restrictions. However, Goette included an additional restriction in his deed of Lot 16 to the Bondesens, as follows:

---

[1] Although there is no summary judgment evidence of a relationship between Aubrey Farb and either Goette or the Bondesens, the Goette deed of Lot 16 reflects that he knew of the Bondesens' simultaneous purchase of Lot 15 from Farb.

    12.  Grantees agree for themselves and their successors
    in title that Lots 15 and 16, Block one (1), Farnham
    Park, Harris County, Texas will be used for no more than
    one single family dwelling and appurtenances thereto.

Id. ex. F.  This restriction will be referred to herein as
"Restriction No. 12."

    Goette, who had built his own home on Lot 17, in 1975 sold Lot
17 and its residence to Defendant, which then used it as the
residence for its Consul-General.  *See* id. ex. G.  In January,
1992, William Bondesen made a written request of Defendant's
Consul-General that he "sign the attached 'WAIVER OF RESTRICTION,'
which will permit us [(the Bondesens)] to separate Lots 15 and 16
into two separate lots, as they are considered by Farnham Park
Committee anyway."  Id. ex. L-1.  The letter explained that after
the Bondesens "re-platted [Lots 15 and 16] into the original two
Lots, we plan to either sell the extra lot, or build a new home on
Lot 16 which would more meet our present needs than our present
home at #15 Farnham Park."  Id.  The letter of request also added:

        The reason we must ask you to sign this is that Mr.
    Goette, from whom The Government of Japan purchased the
    home on Lot 17, had planned to live at #17, and did not
    want us to put up a fence, nor build another house on Lot
    16.  Your Mr. Masao Tsukamoto, of whom we were very fond,
    released the portion pertaining to the fence in 1975,
    before he was re-assigned to Hawaii.

Id.  The attached waiver quoted from Restriction No. 12 and stated
that this restriction "inured to the benefit of Goette because of

3

his ownership of Lot 17. . . ." The waiver then acknowledged that "Goette has no present interest whatsoever in [Lot 16 or Lot 17]," and requested that Japan "waive all of its rights" under the foregoing restriction and "agree [that] Bondesen may build a new home on Lot Sixteen (16) . . . separate and apart from the present residence which is built on Lot 15. . . ." <u>Id.</u> In a letter dated April 13, 1992, Consul-General Imanishi declined to sign the waiver, stating that he had "received instructions from the home government that it is not in a position to consent to the 'WAIVER OF RESTRICTION.'" <u>Id.</u> ex. L-2.

Notwithstanding the recitation in Bondesen's January, 1992, proposed waiver that Goette had no present interest in Lots 16 or 17, William Bondesen obtained from Goette and filed for record a "Release" dated March 13, 1992, which purported to "release forever [the Bondesens] and their successors in title to Lots 15 and 16 . . . from any obligation whatsoever to the said item 12." Document No. 13 ex. I. It had been some 17 years since Goette had owned any right, title, or interest in Lot 17 when he signed this "Release."

About nine years after Defendant as owner of Lot 17 declined to waive its rights under Restriction No. 12, the Bondesens sold Lot 16 to Stonebridge Homes, Inc. ("Stonebridge"). The Bondesens' general warranty deed to Stonebridge made no reference to Restriction No. 12 contained in the Goette-Bondesens deed. *See* <u>id.</u>

4

ex. H.  Stonebridge then on October 3, 2003, by general warranty
deed sold Lot 16 to Plaintiffs, "subject to any and all . . . valid
restrictions . . . if any, to the extent, but only to the extent
that they are reflected by the records of the Office of the County
Clerk. . . ."  Id.

Plaintiffs intend to build a home on Lot 16 and their plans
allegedly were approved by Piney Point Village and the Farnham Park
Homeowners' Association.  See Document No. 11, at 2.  It is
uncontroverted that a single family residence is already situated
on Lot 15.  When Plaintiffs began clearing Lot 16, Defendant's
counsel notified Plaintiffs that construction of a residence on Lot
16 would violate Restriction No. 12 in the Goette-Bondesens deed,
which limited the use of Lots 15 and 16 together to no more than
one single-family dwelling and that Defendant as record owner of
Lot 17 insisted that Plaintiffs comply with the restriction.

Plaintiffs then filed this suit for a declaratory judgment
"interpreting the deeds and the [Goette 1992] Release . . ., and
decreeing that Plaintiffs are free to construct a residence on
Lot 16, and that any restrictions created with respect to Lot 16 by
the deed [from Goette] are ineffective and unenforceable or have
been released by virtue of the [Goette 1992] Release."  Document
No. 11 at 2-3.  Defendant counterclaims for a declaratory judgment
that "the restrictive covenant is in full force and effect, is
fully enforceable by Japan, and that Plaintiffs have breached the

5

covenant." Document No. 8 ¶ 26. Defendant further requests "a permanent injunction against Plaintiffs enjoining the construction of any dwelling on Lot 16 in violation of the restrictive covenant."[2] Both parties move for summary judgment.

## II. Standard of Review

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. See id. at 2553-54. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. See Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998)(citing Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2514-15 (1986)). "[T]he nonmoving party

---

[2] All parties also plead for an award of attorneys' fees.

must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. *See* Anderson, 106 S. Ct. at 2513-14. All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993)(citing Matsushita, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. (citing Anderson, 106 S. Ct. at 2511). Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

## III.  Discussion

Defendant seeks to enforce Restriction No. 12 as a restrictive covenant, and Plaintiffs do not contest that on its face it is a covenant running with the land that limits the use of Lots 15 and 16 together for no more than one single family dwelling. *See* In re

El Paso Refinery, LP, 302 F.3d 343, 355 (5th Cir. 2002); Wayne Harwell Props. v. Pan Am. Logistics Ctr., Inc., 945 S.W.2d 216, 218 (Tex. App.--San Antonio 1997, writ denied).[3] Plaintiffs' challenge to the validity of Restriction No. 12 is that it contravenes and is unenforceable under the FP Restrictions that apply to the entire subdivision.

"A developer generally has the unilateral right to impose on its subdivision, in the first instance, any restrictions that it chooses. . . ." City of Pasadena v. Gennedy, 125 S.W.3d 687, 698 (Tex. App.--Houston [1st Dist.] 2003, pet. denied); see Dyegard Land P'ship v. Hoover, 39 S.W.3d 300, 313 (Tex. App.--Fort Worth 2001, no pet.). Among the FP Restrictions is the following:

> 6. Consolidation or Resubdivision of Lots: The owner or owners of two or more adjoining lots in Farnham may consolidate such lots into one building site, or may resubdivide such lots into two or more building sites, provided the resubdivision does not result in more building sites than the number of platted lots which are resubdivided and each resulting building site is at least as large as the smallest of the platted lots which are resubdivided. Each resulting building site shall be treated as a lot for the purposes of these restrictions and the provisions of this instrument, unless a contrary intent is indicated.

---

[3] As a covenant running with the land, Restriction No. 12 binds successors in interest to Lot 16, such as Plaintiffs. See TX Far West, Ltd. v. Tex. Invs. Mgmt., Inc., 127 S.W.3d 295, 302 (Tex. App.--Austin 2004, no pet.). Even if Restriction No. 12 were not as a matter of law a covenant running with the land, it would be an equitable servitude restricting the use of Lot 16, with Lot 17 being the dominant estate. See id.; In re El Paso Refinery, 302 F.3d at 358; Wayne Harwell, 945 S.W.2d at 218.

Document No. 18 ex. B, at 3 ¶ 6 ("FP Restriction No. 6").   It is uncontroverted that by accepting Goette's Restriction No. 12 in 1972, the Bondesens agreed to "consolidate" Lots 15 and 16 (to which they obtained title on the same date) into one building site that would primarily benefit the owner of Lot 17.  A concomitant benefit would be received by the owner of Lots 15 and 16 who presumably would also enjoy the greater spaciousness derived from lower density housing.[4]  It is further uncontroverted that when the Bondesens conveyed Lot 16 separately to Stonebridge in 2001, they in a sense "resubdivided" Lots 15 and 16 back into two separate Lots as is generally permitted by FP Restriction No. 6.  The question is whether in selling Lot 16 apart from Lot 15 the Bondesens were able to vitiate Restriction No. 12's restriction of only one residence on Lots 15 and 16 together, thereby leaving Plaintiffs--successors in title to the Bondesens--free to construct a residence on Lot 16 even though a residence was already located on Lot 15.

"[R]estrictive covenants are subject to the general rules of contract construction," and must be examined "as a whole in light of the circumstances present when the parties entered the

---

[4] Inasmuch as Restriction No. 12 was recorded along with the deed conveyed from Goette to the Bondesens, all subsequent owners of Lot 16, including Plaintiffs, had constructive notice of the covenant created therein.  *See* <u>Inwood N. Homeowners' Ass'n v. Harris</u>, 736 S.W.2d 632, 635 (Tex. 1987); TEX. PROP. CODE ANN. § 13.002 (Vernon 2004).

agreement." Pilarcik v. Emmons, 966 S.W.2d 474, 478 (Tex. 1998).
"A restrictive covenant shall be liberally construed to give effect
to its purposes and intent." TEX. PROP. CODE ANN. § 202.003(a)
(Vernon 1995).[5] "However, doubts should be resolved in favor of
the free and unrestricted use of the premises, and any ambiguity
must be strictly construed against the party seeking to enforce the
restrictive covenant." Buckner v. Lakes of Somerset Homeowners
Ass'n, Inc., 133 S.W.3d 294, 297 (Tex. App.--Fort Worth 2004, pet.
denied).[6] A restrictive covenant is unambiguous as a matter of law
if it can be given a definite or certain legal meaning, but is
ambiguous if it is susceptible to more than one reasonable
interpretation. See Pilarcik, 966 S.W.2d at 478. However, "[m]ere
disagreement over the interpretation of a restrictive covenant does
not render it ambiguous." Buckner, 133 S.W.3d at 297.

---

[5] This requirement "applies to all restrictive covenants
regardless of the date on which they were created." TEX. PROP. CODE
ANN. § 202.002(a) (Vernon 1995).

[6] Texas courts have disagreed about the effect of
§ 202.003(a)'s liberal construction mandate on common law rules
favoring strict construction. See, e.g., Gennedy, 125 S.W.3d at
692-95 (discussing differing cases and viewpoints). Although
neither the Texas Supreme Court nor the Fifth Circuit appears to
have resolved the matter, this Court finds no conflict between §
202.003(a) and the common law tradition that words used in a
restrictive covenant are given their commonly accepted meaning, or
that doubt is resolved in favor of free and unrestricted use and
ambiguity is resolved against the party seeking enforcement. See
Buckner, 133 S.W.3d at 297; Gennedy, 125 S.W.3d at 692-93; Reagan
Nat'l Adver. v. Capital Outdoors, Inc., 96 S.W.3d 490, 493 n.2
(Tex.App.--Austin 2002, pet. granted, judgm't vacated w.r.m.);
Munson v. Milton, 948 S.W.2d 813, 816 (Tex. App.--San Antonio 1997,
pet. denied).

When a subdivision is subject to developer-imposed general restrictions that contain a mechanism for amendment, an owner of property within the subdivision cannot unilaterally amend those restrictions without using the amendment process. *See* VICC Homeowners' Ass'n, Inc. v. Los Campeones, Inc., 143 S.W.3d 832, 836 (Tex. App.--Corpus Christi 2004, no pet.) (internal citations omitted); Miller v. Sandvick, 921 S.W.2d 517, 521-22 (Tex. App.-- Amarillo 1996, writ denied); *see also* Youssefzadeh v. Brown, 131 S.W.3d 641, 644-45 (Tex. App.--Texarkana 2004, no pet.) (holding that attempted amendment of developer-imposed restrictive covenants did not utilize the provided amendment process and was therefore "of no force and effect"). Given the Bondesens' separate sale of Lot 16 in what Plaintiffs regard as a "resubdivision" of Lots 15 and 16 into *building sites*, Plaintiffs argue that to enforce Restriction No. 12 would essentially "amend" the FP restrictions because the "uniform plan" created by those restrictions "desired for *building sites* to be improved and developed, and required that *building sites* be used for residential purposes, not left vacant." Document No. 19, at 6 (emphasis added).

The FP restrictions do include a preliminary paragraph expressing Farnham Corp.'s "desire[] to create and carry out a uniform plan for the improvement, development, and sale of lots and building sites in Farnham. . . ." Document No. 18 ex. B, at 1. Nothing in the FP restrictions, however, compels the owner of a lot

11

or building site actually to build--or even to be able to build--anything. Thus, even though the Bondesens' sale of Lot 16 amounted to a "resubdivision" of Lots 15 and 16 into two "building sites," the FP Restrictions do not require that Plaintiffs build or be able to build a residence on Lot 16. Plaintiffs contend this result runs contrary to the FP Restriction that "[l]ots and building sites in Farnham shall be used for *residential* purposes only. . . ." Id. (emphasis added). That clause is lifted from the first FP Restriction and must be read in context:

> 1. Use: Lots and building sites in Farnham shall be used for residential purposes only, and no buildings shall be placed on any lot or building site except one single family residence, which shall not exceed three stories in height, and a private garage, which shall not exceed the height of the residence and which may contain living quarters only for bona fide servants.

Id. When considered in context, therefore, the clause relied on by Plaintiffs does not direct the erection of a residence on every lot and building site. Rather, it is designed to ensure that buildings that are placed on the lots and building sites are not used for commercial purposes or for other than single family residences.

If Restriction No. 12 is *not* in conflict with the FP Restrictions, Plaintiffs nonetheless argue that it is ineffective because Goette in placing the "additional restriction" on his lot did not "adhere to the procedures for amendment or modification set out in the uniform plan." Document No. 19, at 3. Plaintiffs point

to the <u>Youssefzadeh</u> court's statement that if "every lot owner could place restrictions on his own lot . . . a uniformly planned subdivision could fall into disarray." <u>Youssefzadeh</u>, 131 S.W.3d at 645. That case, however, involved a corporate property owner's unilateral attempt "to change the characterization of [its particular block] from commercial use to part commercial and part residential use." *See* <u>id.</u> at 643. The court regarded that action as an attempt to *amend* the restrictive covenants originally imposed on the larger subdivision without following the prescribed amendment process. *See* <u>id.</u> at 643-45.[7] As explained above, however, Restriction No. 12 does not conflict with or purport to amend the generally applicable FP Restrictions. Rather, it operates to limit the density of housing on Lots 15 and 16 together to one residence, which is the kind of consolidation of Lots that FP Restriction No. 6 expressly approves. Hence, Restriction No. 12

---

[7] Plaintiffs also cite <u>Taylor v. McLennan County Crippled Children's Ass'n</u>, 206 S.W.2d 632 (Tex. Civ. App.--Waco 1947, writ ref'd n.r.e.). <u>Taylor</u> involved an attempt to impose residential restrictions on several but not all lots in Block 5, which was part of a much larger 16-year-old subdivision. The original subdivision plan and restrictions specifically exempted all lots in Block 5, which was situated across the street from a hospital, from being burdened with the residential restrictions that applied to all other lots in the subdivision. The Court in <u>Taylor</u> found that the attempt selectively to impose residential restrictions 16 years later was "violative of and in direct conflict with the 1924 restrictions in that under the 1924 restrictions all lots in Block 5 were expressly exempted" from the residential use restrictions. In contrast, in this case Restriction No. 12 is not in conflict with the original scheme of the subdivision, which expressly contemplated the possibility of reduced density of residences by combining two Lots for only one residence.

produced a consolidation consistent with the overall residential scheme of the subdivision.  Moreover, the FP Restrictions impose no restraint on two owners of three lots agreeing--as Goette and the Bondesens did--to consolidate two lots under terms that impose an equitable servitude on the combined lots in favor of the adjacent lot, which is the dominant estate.  Therefore, because the combination of the two lots for use as one dwelling site is in harmony with what is expressly declared as possible in the FP Restrictions, the individual owners are free to impose a restriction such as Restriction No. 12 in the Goette-Bondesens deed as an equitable servitude in favor of Lot 17.  This was plainly a part of the bargain when Goette sold Lot 16 to the Bondesens.

Plaintiffs next rely on a 1992 "Release" in which Goette purports to release the Bondesens and their successors in title from the burden of Restriction No. 12.  The Bondesens procured this Release from Goette and filed it for public record in the same year that The Government of Japan as owner of Lot 17 refused the Bondesens' request to waive Restriction No. 12.  Goette had sold to Defendant all of his interest in the dominant estate, Lot 17, in 1975, some 17 years before signing the putative "Release."  Because Restriction No. 12 is not a personal covenant, but rather a covenant running with the land or at least an equitable servitude, Goette's purported "Release" is of no effect.  In other words, in 1992, Goette possessed no interest to release.

14

Plaintiffs further assert that enforcement of Restriction No. 12 would violate public policy, because "Lot 16 must now and forever remain vacant so long as a house remains on Lot 15 (or vice versa)." Document No. 19, at 8. "Landowners have the right to impose any restrictions they choose so long as the restrictions are not against public policy or illegal." Harrison v. Air Park Estates Zoning Comm., 533 S.W.2d 108, 111 (Tex. Civ. App.--Dallas 1976, no writ); see, e.g., Farmer v. Thompson, 289 S.W.2d 351, 354 (Tex. Civ. App.--Fort Worth 1976, writ ref'd n.r.e.)(holding that restrictions which, if enforced, would impair sovereign right of eminent domain, violate public policy). "Restrictions which amount to a prohibition of use of the property granted are void." Pearson v. Fort Worth Nat'l Bank, 564 S.W.2d 175, 176 (Tex. Civ. App.--Fort Worth 1978, writ ref'd n.r.e.). Restriction No. 12, however, does not prohibit the use of Lot 16. Lot 16 may be used in conjunction with Lot 15 for one single family dwelling, for "appurtenances" to the single family dwelling on Lot 15, or as a site for a residence if the dwelling on Lot 15 is demolished. Plaintiffs cite no authority indicating that Restriction No. 12 violates public policy under these circumstances.

Finally, in the Supplement to their Motion for Summary Judgment (Document No. 29) Plaintiffs raise a new argument of estoppel based on a letter that they received a copy of less than three months ago. Plaintiffs assert that in 1998 Defendant's then

Consul-General Hitoshi Honda signed a letter he had received from the Bondesens approving a replat of Lots 15 and 16 "back to two (2) single family lots. . . ."  *See* Document No. 29 ex. A.[8]  The contents of this letter, summarized in footnote 8 and which does not mention Restriction No. 12, does not estop Defendant from enforcing the covenant in this case.  Moreover, even assuming Honda possessed authority to approve replatting on Defendant's behalf-- which Plaintiffs do not show--no consideration for this claimed release has been established.  *See* Tamez v. Southwestern Motor Trans., Inc., 155 S.W.3d 564, 571 (Tex. App.--San Antonio 2004, no pet.) (explaining that a release agreement "must be supported by valid consideration," such as "a benefit to the releasor or a detriment to the person released").

Restriction No. 12 is therefore a valid restrictive covenant enforceable against Plaintiffs as a covenant running with the land or as an equitable servitude on Lot 16 with Lot 17 being the

_____

[8] Unlike the Bondesens' unsuccessful formal approach to The Government of Japan in 1992, the Bondesens' 1998 letter to the Consul-General was personal in its salutation ("Dear Hitoshi and Keiko") and casual in its content, making no specific mention of Restriction No. 12 nor any request for a waiver or release of Restriction No. 12.  The letter simply explains that the Bondesens' home on Lot 15 had sustained significant flood damage and they were attempting repairs--but were not ultimately sure what they "would be able to do," might have to "demolish the garages on Lot 16 and build a new home on that lot," and "would appreciate it if you would approve of our replatting Lots 15 and 16 back to single-family lots. . . ."  *See* Document No. 29 ex. A.  Nowhere in the letter did the Bondesens indicate that they intended to construct a house on Lot 16 without first removing the house on Lot 15.

dominant estate. The uncontroverted summary judgment evidence is that Plaintiffs breached this restriction by beginning construction of a dwelling on Lot 16 while a residence was already being maintained on Lot 15. *See* Document No. 10 ¶ 3. Defendant is therefore entitled to both declaratory and injunctive relief. *See* <u>Voice of the Cornerstone Church v. Pizza Prop. Partners</u>, 160 S.W.3d at 668 (Tex.App.--Austin 2005, no pet.) ("A restrictive covenant may be enforced by injunction where a distinct or substantial breach is shown, without regard to the amount of damages caused by the breach."); <u>Protestant Episcopal Church Council of the Diocese of Tex. v. McKinney</u>, 339 S.W.2d 400, 403 (Tex. Civ. App.--Eastland 1960, writ ref'd) (explaining that no showing of irreparable injury is necessary to enforce a covenant restricting the use of land).[9]

## IV.   <u>Order</u>

For the foregoing reasons, it is

ORDERED that Defendant The Government of Japan's Motion for Summary Judgment (Document No. 18) is GRANTED, and the Court holds as follows:

---

[9] Defendant is further entitled to recover attorney's fees. *See* TEX. PROP. CODE ANN. § 5.006 (Vernon 2004)("In an action based on breach of a restrictive covenant pertaining to real property, the court shall allow to a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim."); <u>Jakab v. Gran Villa Townhouses Homeowners Ass'n, Inc.</u>, 149 S.W.3d 863, 867 (Tex. App.--Dallas 2004, no pet.).

1.   The restriction set forth in Restriction No. 12 of Exhibit A
     to the November 22, 1972 Warranty Deed conveying Lot 16,
     Farnham Park, Section One from James L. Goette to William K.
     Bondesen and Norma R. Bondesen (Harris County Clerk File No.
     D752380) is a valid restrictive covenant, enforceable against
     the owners of Lot 16, Plaintiffs Joseph A. Aufman and Judith
     Aufman, as a covenant running with the land or as an equitable
     servitude.

2.   Plaintiffs' commencement of construction of a dwelling on
     Lot 16 is in violation of the foregoing restriction because it
     would result in simultaneous use of Lots 15 and 16 together
     for more than one single family dwelling and appurtenances
     thereto.

3.   Plaintiffs are permanently enjoined from constructing any
     dwelling on Lot 16 that would result in a use of Lots 15 and
     16 together for more than one single family dwelling and
     appurtenances thereto.


It is further

     ORDERED that Plaintiffs Joseph A. Aufman's and Judith Aufman's

Motion for Summary Judgment (Document No. 13) is DENIED, and their

claims against Defendant The Government of Japan are DISMISSED.[10]

---

     [10] Also pending are Defendant's Motion for Order of Protection
(Document No. 28) and Defendant's Supplement to its Unopposed
Motion to Seal (Document No. 35) which are both DENIED.  The Court
previously granted Defendant's unopposed motion to file under seal
Exhibits L, L-1, and L-2, which are the subject of Defendant's
Motion at Doc. No. 28.  Defendant's letter to the Court attached to
Defendant's Response at Document No. 33 was not filed under seal.
All of these instruments are discussed in the briefs filed by the
parties.  None of these filings in the opinion of the Court merits
confidentiality and none would appear to waive Defendant's
protections under the Vienna Convention.  If Defendant's disclo-
sures of the exhibits do constitute a waiver, then that is the
consequence of Defendant's decision to disclose the documents from
their archives in support of their counterclaim against Plaintiffs
in a Court of the United States where proceedings are generally
open.

The parties shall forthwith confer in good faith with each other to reach agreement on a reasonable amount of attorney's fees and expenses that should be adjudged against Plaintiffs and shall jointly advise the Court of those amounts within 14 days after the entry of this Order.  Agreement on these amounts will be without prejudice to Plaintiffs reserving their objection, if any, to any award at all and to their rights of appeal from the Final Judgment that will then be entered.  If agreement is not reached, the Court will set a conference with counsel to consider any impediments that exist.

The clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this 22nd day of August, 2005.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE